1
2
3
4
5
6
7
8
9
10

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

11

MICHAEL A. LOCKHART,

12              Petitioner,

13      v.

14

15   G. J. JANDA, Warden,

16              Respondent.

17

)
)
)
)
)
)
)
)
)
)
)
)
)
)

No. C 13-00014 EJD (PR)

**ORDER DENYING PETITION
FOR WRIT OF HABEAS CORPUS;
DENYING CERTIFICATE OF
APPEALABILITY**

18      Michael Lockhart, a state prisoner incarcerated at Santa Rita Jail, has filed this <u>pro</u>

19   <u>se</u> action seeking a writ of habeas corpus under 28 U.S.C. § 2254.  The matter is now

20   before the Court for consideration of the merits of the habeas petition.  For the reasons

21   discussed below, the petition is DENIED.

22                        **PROCEDURAL HISTORY**

23      On May 14, 2010, an Alameda County jury found Petitioner guilty of possession

24   of a controlled substance for sale, Cal. Health & Safety Code § 11351, and of

25   transportation of a controlled substance, Cal. Penal Code §11352(a).  Clerk's Transcript

26   ("CT")[1] at 131–32 and 562.  In a bifurcated proceeding, on June 1, 2010, the trial court

27   found two prior strike conviction allegations to be true.  CT at 566–71.  On October 15,

28

---

[1]The Clerk's Transcript is lodged at Docket Nos. 22 and 23.

1  2010, the court sentenced Petitioner to an indeterminate term of 25 years to life.  CT at

2  609–10.

3        Petitioner appealed his conviction in the California Court of Appeal.  Docket No.

4  30, Ex. C.  On October 27, 2011, the California Court of Appeal filed an unpublished

5  opinion affirming the judgment.  People v. Lockhart, No. A130090, 2011 WL 5118780

6  (Cal. Ct. App. October 27, 2011).  On January 4, 2012, the California Supreme Court

7  denied Petitioner's petition for review.  Docket No. 30, Ex. H.

8

9        On January 2, 2013, Petitioner filed the instant federal petition.  On March 14,

10  2013, this Court ordered Respondent to show cause as to why the petition should not be

11  granted.  Respondent filed an answer and Petitioner has filed a traverse.[2]

12                                **BACKGROUND**

13        The following factual background is taken from the order of the California Court

14  of Appeal.

15        At about 8:35 a.m. on March 18, 2007, Alameda County Sheriff's Deputies
   Michael Giammalvo and Rui Marques were on duty at Highland Hospital and
16   received a police dispatch advising that a shooting had just occurred at 66th
   and Bancroft and that a gunshot wound victim might be coming to the hospital
17   in a brown Ford Bronco. The deputies found the described vehicle parked at the
   emergency drop-off area. Giammalvo located the gunshot victim, John King, in
18   the vehicle and requested the assistance of medical staff.

19        Lockhart was the driver of the Ford Bronco. [FN5] As Giammalvo was dealing
   with King, Lockhart got out of the vehicle and started walking away. Marques
20   detained Lockhart and attempted to conduct a patsearch. [FN6]  As Marques
   was trying to conduct the patdown search, Lockhart reached into his left front
21   pants pocket, removed a clear plastic baggie containing a white powder, and
   threw it into the Bronco. Giammalvo also saw Lockhart drop or throw the
22   baggie into the vehicle. Giammalvo located the plastic baggie that Lockhart
   had thrown on the floor on the driver's side of the Bronco, near the center
23   console. The bag contained 27.20 grams of cocaine. It had a street value of
   $650–$750 and contained "many doses."

24
25        FN 5: The Bronco was also registered to Lockhart.

26        [2]The Court has struck the following portions of the Traverse: the unexhausted portions of
27   Exhibit 1, and Exhibits 2 through 6.  Docket No. 43.  These exhibits were never exhausted
   before the state courts and therefore are not subject to review by this Court.  Id.; see also Cullen
28   v. Pinholster, 131 S. Ct. 1388, 1398 (2011) ("review under § 2254(d)(1) is limited to the record
   that was before the state court that adjudicated the claim on the merits").

1

2

FN 6: A hospital video security camera captured the incident and the video was played before the jury.

3   Lockhart, 2011 WL 5115780, at *1.

4   <center>**DISCUSSION**</center>

5   **I.   <u>Standard of Review</u>**

6       This Court may entertain a petition for writ of habeas corpus "in behalf of a person

7   in custody pursuant to the judgment of a State court only on the ground that he is in

8   custody in violation of the Constitution or laws or treaties of the United States."  28

9   U.S.C. § 2254(a).  Under the Antiterrorism and Effective Death Penalty Act of 1996

10  ("AEDPA"), a district court may not grant a petition challenging a state conviction or

11  sentence on the basis of a claim that was adjudicated on the merits in state court unless

12  the state court's adjudication of the claim "(1) resulted in a decision that was contrary to,

13  or involved an unreasonable application of, clearly established Federal law, as determined

14  by the Supreme Court of the United States; or (2) resulted in a decision that was based on

15  an unreasonable determination of the facts in light of the evidence presented in the State

16  court proceeding."  28 U.S.C. § 2254(d).  The first prong applies both to questions of law

17  and to mixed questions of law and fact, <u>Williams v. Taylor</u>, 529 U.S. 362, 384–86 (2000),

18  while the second prong applies to decisions based on factual determinations, <u>Miller-El v.

19  Cockrell</u>, 537 U.S. 322, 340 (2003).

20      "Under the 'contrary to' clause, a federal habeas court may grant the writ if the

21  state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a

22  question of law or if the state court decides a case differently than [the] Court has on a set

23  of materially indistinguishable facts.  Under the 'unreasonable application' clause, a

24  federal habeas court may grant the writ if the state court identifies the correct governing

25  legal principle from [the Supreme Court's] decisions but unreasonably applies that

26  principle to the facts of the prisoner's case."  <u>Williams</u>, 529 U.S. at 412–13.  "Under §

27  2254(d)(1)'s 'unreasonable application' clause, . . . a federal habeas court may not issue

28  the writ simply because that court concludes in its independent judgment that the relevant

1    state-court decision applied clearly established federal law erroneously or incorrectly."

2    <u>Id.</u> at 411.  A federal habeas court making the "unreasonable application" inquiry should

3    ask whether the state court's application of clearly established federal law was

4    "objectively unreasonable."  <u>Id.</u> at 409.  The federal habeas court must presume correct

5    any determination of a factual issue made by a state court unless the petitioner rebuts the

6    presumption of correctness by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

7        The state court decision to which Section 2254(d) applies is the "last reasoned

8    decision" of the state court.  <u>See</u> <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 804 (1991); <u>Barker</u>

9    <u>v. Fleming</u>, 423 F.3d 1085, 1091–92 (9th Cir. 2005).  When there is no reasoned opinion

10   from the highest state court considering a petitioner's claims, the court "looks through" to

11   the last reasoned opinion.  <u>See</u> <u>Ylst</u>, 501 U.S. at 804.  The denial of review by the

12   California Supreme Court was a summary denial.  Docket No. 30, Ex. H  Thus, the last

13   reasoned opinion is the California Court of Appeal's opinion on direct review.  <u>Id.</u>, Ex. F

14   and <u>People v. Lockhart</u>, 2011 WL 5118780.

15       The Supreme Court has vigorously and repeatedly affirmed that under AEDPA,

16   there is a heightened level of deference a federal habeas court must give to state court

17   decisions.  <u>See</u> <u>Hardy v. Cross</u>, 132 S. Ct. 490, 491 (2011) (per curiam); <u>Harrington v.</u>

18   <u>Richter</u>, 562 U.S. 86, 103–04 (2011); <u>Felkner v. Jackson</u>, 131 S. Ct. 1305, 1307 (2011)

19   (per curiam).  As the Court explained:  "[o]n federal habeas review, AEDPA 'imposes a

20   highly deferential standard for evaluating state-court rulings' and 'demands that

21   state-court decisions be given the benefit of the doubt.'"  <u>Felkner</u>, 131 S. Ct. at 1307

22   (citation omitted).  With these principles in mind regarding the standard and limited scope

23   of review in which this Court may engage in federal habeas proceedings, the Court

24   addresses Petitioner's claims.

25   **II.    <u>Petitioner's Claims</u>**

26       Petitioner claims the following two grounds for federal habeas relief:  (1) the trial

27   court erred by failing to dismiss a prior strike; and (2) the trial court erroneously denied a

28   <u>Batson</u> motion after the prosecutor used a peremptory challenges to remove a black juror.

1    **A.    Sentencing Error**

2        Petitioner's first claim is that the trial court erred by failing to dismiss a prior strike

3    for sentencing purposes.   Docket No. 1 ("Pet.") at 6–7.  Petitioner argues that the trial

4    court should have dismissed his prior strike because the "three strikes" law was "intended

5    for recidivist offenders who repeatedly commit violent felonies threatening the public at

6    large, and Petitioner did not fall within the spirit of three strikes law.  Pet. at 7 and Docket

7    No. 38-1 at 16.  Petitioner also alleges that the particulars of his case warrant dismissing

8    his prior strike.  Docket No. 38-1 at 12–16.

9        This claim is based solely on the interpretation of state law and not cognizable in

10   this action.  See Estelle v. McGuire, 502 U.S. 62, 67–68 (1991) (holding that mere errors

11   in the application of state law are not cognizable on habeas corpus); Miller v. Vasquez,

12   868 F.2d 1116, 1118–19 (9th Cir. 1989) (finding California state enhancement provisions

13   involve questions of state law not subject to federal habeas review); see also Ely v.

14   Terhune, 125 F. Supp. 2d 403, 411 (C.D. Cal. 2000) (holding trial court's refusal to

15   dismiss one of petitioner's prior strike convictions was not cognizable in a federal habeas

16   proceeding).  Accordingly, Petitioner is not entitled to habeas relief on this claim.

17   **B.    Jury Selection**

18       Petitioner's second claim is that the trial court erroneously denied a Batson motion

19   after the prosecutor used a peremptory challenge to remove a black juror, thereby

20   violating Petitioner's constitutional rights under the Fifth, Sixth, and Fourteenth

21   Amendments.  The California Court of Appeal denied this claim as follows:

22       During jury selection, the prosecutor exercised a peremptory challenge to
         prospective juror J.H., an African–American woman. Lockhart made a
23       Batson/Wheeler objection/motion, asserting that the prosecutor had
         improperly challenged the prospective juror on the basis of race, and
24       moved to discharge the jury panel. The trial court found that Lockhart had
         made a prima facie showing of racial discrimination and requested that the
25       prosecutor provide permissible race-neutral reasons for the peremptory
         challenge. After hearing the prosecutor's sworn responses, the court
26       accepted the prosecutor's explanation and denied the motion.

27       Lockhart contends that the trial court's finding that there was no improper
         racial motive was "wrong" and that, as a matter of law, "the totality of the
28       circumstances, including the prospective juror's answers and comments,
         do not support a non-racially motivated reason for the challenges."

1

1. Standard of Review

Both the California and federal Constitutions forbid a prosecutor from excluding prospective jurors from the jury for a racially discriminatory purpose. (Batson, supra, 476 U.S. at pp. 84–89, 95–96; Wheeler, supra, 22 Cal.3d at pp. 276–277, 148 Cal.Rptr. 890, 583 P.2d 748.) The "exclusion by peremptory challenge of a single juror on the basis of race or ethnicity is an error of constitutional magnitude requiring reversal. [Citations.]" (People v. Silva (2001) 25 Cal.4th 345, 386, 106 Cal.Rptr.2d 93, 21 P.3d 769.)

There are three stages in the trial court's evaluation of a Batson/Wheeler challenge to a peremptory strike: "'"First, the defendant must make out a prima facie case 'by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.' [Citations.] Second, once the defendant has made out a prima facie case, the 'burden shifts to the State to explain adequately the racial exclusion' by offering permissible race-neutral justifications for the strikes. [Citations.] Third, '[i]f a race-neutral explanation is tendered, the trial court must then decide ... whether the opponent of the strike has proved purposeful racial discrimination' [Citation.]" '[Citations.]" (People v. Zambrano (2007) 41 Cal.4th 1082, 1104, 63 Cal.Rptr.3d 297, 163 P.3d 4 (Zambrano), disapproved on another point in People v. Doolin (2009) 45 Cal.4th 390, 421, fn. 22, 87 Cal.Rptr.3d 209, 198 P.3d 11; see also Johnson v. California (2005) 545 U.S. 162, 168, 125 S.Ct. 2410, 162 L.Ed.2d 129.)

"At the third stage of the Wheeler/Batson inquiry, 'the issue comes down to whether the trial court finds the prosecutor's race-neutral explanations to be credible. Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy.' [Citation.] In assessing credibility, the court draws upon its contemporaneous observations of the voir dire." (People v. Lenix (2008) 44 Cal.4th 602, 613, 80 Cal.Rptr.3d 98, 187 P.3d 946 (Lenix), fn. omitted.) The ultimate question the trial court must determine is "whether the advocate allowed his or her calculus to be infected by racial bias and then lied to the court in an attempt to get away with it." (Id. at p. 626, 80 Cal.Rptr.3d 98, 187 P.3d 946.)

Review of a trial court's denial of a Batson/Wheeler motion is deferential. (Lenix, supra, 44 Cal.4th at p. 626, 80 Cal.Rptr.3d 98, 187 P.3d 946.) "'We review the trial court's ruling on purposeful racial discrimination for substantial evidence. [Citation.] It is presumed that the prosecutor uses peremptory challenges in a constitutional manner.'" (Zambrano, supra, 41 Cal.4th at p. 1104, 63 Cal.Rptr.3d 297; People v. Turner (1994) 8 Cal.4th 137, 165, 32 Cal.Rptr.2d 762, 878 P.2d 521 [it is presumed "that a prosecutor uses his or her peremptory challenges in a constitutional manner"], overruled on different grounds in People v. Griffin (2004) 33 Cal.4th 536, 555, fn. 5, 15 Cal.Rptr.3d 743, 93 P.3d 344.) "Since the trial judge's findings [on this issue] largely will turn on evolution of credibility, a reviewing court ordinarily should give those findings great deference" (Batson, supra, 476 U.S. at p. 98, fn. 21), "recogniz[ing] that such a ruling 'requires trial judges to make difficult and often close judgments.'" (Wheeler, supra, 22 Cal.3d at p. 281, 148 Cal.Rptr. 890, 583 P.2d 748.) Acknowledge that "these determinations of credibility and demeanor lie "'peculiarly within a trial judges's province,'" " the United States Supreme Court has also stated that in making such decisions, "'in

1    the absence of exceptional circumstances, [it] would defer to [the trial
     court].' [Citation.]" (Snyder v. Louisiana (2008) 552 U.S.472, 477, 128
2    S.Ct. 1203, 170 L.Ed.2d 175.)

3    2. J.H.'s Voir Dire Responses
     Prospective juror J.H., in both her juror questionnaire [FN 7] and in her
4    answers on voir dire, said that she had relatives who were convicted of
     serious crimes. Under further questioning, she admitted that her two
5    brothers had attempted to rob an armored car and "somebody got killed."
     She had been subpoenaed to their trial. Both were convicted and
6    incarcerated. J.H. currently lived with one of her brothers (the other was
     deceased), but they did not discuss his prior convictions. She said that she
7    did not know enough about her brothers' convictions to form an opinion
     about whether they had been treated fairly.

8
             FN 7: The questionnaire completed by J.H. could not be located,
9            and is not part of this record. Certain of J.H.'s questionnaire
             responses were referenced during her voir dire. A copy of the form
10           used is included in the clerk's transcript.

11   J.H. also stated she had close relatives working in law enforcement, and
     that those relationships would not affect her ability to be fair. She agreed
12   that she would judge all witnesses by the same standard and said that she
     could be fair to both sides. In her questionnaire, she stated, "I feel the
13   system is good and fair," and said that was true even with respect to her
     brothers. She also wrote that she had "no reaction" to the charges against
14   Lockhart and had no feelings about drug charges or drug laws in general.

15   Both sides passed prospective juror J.H. for cause. The prosecutor
     exercised his third peremptory challenge against J.H.
16
17   3. The Prosecutor's Explanation
     The prosecutor gave the following explanation under oath:

18   "Okay. [J.H.], as I've indicated, as a prosecutor, one of the things that
     concerned me most by [J.H.] is obviously the fact that her brothers were
19   convicted of very serious crimes, perhaps the most serious crimes, and she
     just referred to them in very general terms in the questionnaire in certain
20   places, she did identify in one location in the questionnaire as robbery and
     murder. [¶] And when I asked her the first questions about those incidents,
21   she was extremely hesitant and reluctant to provide any information. That
     hesitancy and reluctance is not a characteristic that I find conducive with a
22   juror who ... can be fair and impartial and approach the prosecution's case
     with an open mind. [¶] She indicated it was a long time ago, and she did
23   not remember a lot about it. So, obviously, recognizing that it's not an
     easy subject matter to talk about, I decided to ask her further questions to
24   see if she was going to be more forthcoming. [¶] And to be quite honest,
     and I think [defense counsel] sensed and felt her hesitancy and
25   awkwardness in her response to the questions, which is why he objected
     to me continuing to ask questions, but it was literally pulling the
26   information from within her that I could detect, based on her demeanor
     and her appearance was there, but it was simply her reluctance to provide
27   the information. [¶] I asked her about what was bad or good about the
     experience based upon her identification as her brothers being people who
28   had both good and bad experiences with law enforcement. She indicated
     the incarceration part was bad, but she couldn't elaborate any further. [¶]

She basically gave the impression that she did not know very much about the case. I think that was belied by her responses. [Defense counsel] described it as her biggest sin and only sin that she didn't remember right away what happened with her brothers. [¶] I agree with that assessment, and he—

"THE COURT: In fact, you really didn't ask a lot of questions about anything except that, did you?

"[PROSECUTOR]: Correct, given the time constraints that the court has put upon us, and given her obvious reluctance and hesitancy in responding to my questions initially about that, I felt that it was proper[ ] for me to continue my line of questioning about that. [¶] And [defense counsel] admits that [J.H.] did not admit right away about what happened with her brothers, and I had to exact [sic ] that information from her. [¶] And it became clear to me, based upon her responses the amount of pause took before answering the questions and her demeanor, that she actually knew more information. [¶] For example, on page 15 of her questionnaire, she outlines exactly where her brothers were incarcerated, Tracy, Folsom, Soledad. But she insisted that here in court she did not know much about the case. [¶] I then asked her further questions, and she then indicated that she knew it was in San Francisco, she knew that it was the robbery of an armored car, she denied knowing who the victim was in the case, and she made it seem like she was extremely distant from her brothers. [¶] What later comes out is the fact she was living in the Bay Area at the time. She was not living in Ohio, which was the initial impression, and that she only indicated that she got the information from her parents, even though she was the family member, or at least one other family member living here in the Bay Area. [¶] When I asked her whether or not she had an opinion about whether or not her brothers were treated fairly by the criminal justice system, her only response was 'I guess so.' [¶] Then she referred to the fact they had a trial, and she guessed that the jury must have thought they were guilty. [¶] I just felt that with all of her responses, she was attempting to distance herself from that. While some of that can be understood, it's her general reluctance and hesitancy to respond to the questionnaire and to the questions that I asked her, specifically about those issues. [¶] That leads me to believe that she is not the type of person who would be forthcoming, who can be fair and impartial, given those experiences, and, quite frankly, I wouldn't want any juror, regardless of their race, who is going to hide information, be reluctant to provide information to this court in this process, in any fashion whatsoever. I felt that's exactly what she was doing. [¶] So [defense counsel] can describe it as her only sin, but in my mind that's a fatal sin from the prosecution's perspective. It's a very, very serious crime, and if she has that attitude about a very serious crime, including felony murder of someone involved in a robbery, committed by not one, but two of her relatives, brothers, I'm not sure you can get closer in terms of relatives, one of whom she still lives with, even though she didn't provide that information voluntarily either, I just felt she would not be a fair and impartial juror in this case. [¶] And when you compare her responses on a big issue like murder and robbery, I didn't think she would be appropriate to serve on the case involving narcotics, which some people would say is not of the same magnitude or gravity."

4. The Trial Court's Findings
The trial court accepted the prosecutor's explanation. In denying the

motion, the court stated: "It occurred to me, even then before there was a new motion, that yes, [the prosecutor] was finding out so much information from this person that there was a question of whether or not the person was, in fact, being accurate and truthful or was actually withholding information. [¶] I don't think the potential juror was in any way being dishonest from the total summary, but the reality that he could be concerned about that was real. She sure seemed to remember, once pushed, a lot of things .[¶] So I am accepting his sworn testimony that that potential juror created problems for him because of that conduct, and it had nothing to do with race. I'm also clear, I think, in finding the presumption that on paper I begin with the idea that this person could be compared to others and would be satisfactorily even be seen as a pro-prosecution juror possibly, so as we did the presumption test, and it was passed well. But the reality is, I accept [the prosecutor's] position completely. [¶] As you both know, you've both been in front of me, [the prosecutor] has actually done trials in front of me, I have not in any way considered in past experiences in [the prosecutor] in any evaluation in this case. [¶] If I thought I had the right or the duty to do so. I would not have found any presumption could or would exist in this situation, because I've seen the pictures before. But I don't think I have a right to do that, so I didn't do that. [¶] That's the court's ruling, so the court will deny the motion."

Lockhart nevertheless insists that the trial court's credibility finding is erroneous because "[n]o forthright prosecutor would ever dismiss such a juror." It is not, however, the opinion of defense counsel as to a juror's qualifications or desirability that is relevant. Certainly the reasons given by the prosecutor were not inherently implausible. (See People v. Reynoso (2003) 31 Cal.4th 903, 916, 3 Cal.Rptr.3d 769, 74 P.3d 852 (Reynoso) ["implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination"].) Moreover, a prosecutor could have reasonable concerns that a juror whose two brothers had been convicted of serious offenses, particularly one who appeared reluctant to provide relevant information, might harbor some bias against the prosecution, regardless of her other answers. (See Wheeler, supra, 22 Cal.3d at p. 277 & fn. 18, 148 Cal.Rptr. 890, 583 P.2d 748 [relative convicted of crime "give[s] rise to a significant potential for bias against the prosecution"].) A "prosecutor is entitled to exercise a certain number of peremptory challenges simply on a suspicion that the juror will be unfavorable to his or her cause...." (People v. Pinholster (1992) 1 Cal.4th 865, 914, 4 Cal.Rptr.2d 765, 824 P.2d 571, disapproved on other grounds by People v. Williams (2010) 49 Cal.4th 405, 459, 111 Cal.Rptr.3d 589, 233 P.3d 1000.) "The proper focus of a Batson/Wheeler inquiry, of course, is on the subjective genuineness of the race-neutral reasons given for the peremptory challenge, not on the objective reasonableness of those reasons. [Citation.]" (Reynoso, at p. 924, 3 Cal.Rptr.3d 769, 74 P.3d 852.)

"The ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike. [Citation.]" (Lenix, supra, 44 Cal.4th at pp. 612–613, 80 Cal.Rptr.3d 98, 187 P.3d 946.) The trial court's finding that the prosecutor's expressed reasons for the exercise of the challenge were genuine, credible and race-neutral are supported by substantial evidence. The totality of the relevant facts does not give rise to an inference of discriminatory purpose.

1  Lockhart, 2011 WL 5118780, at *2–*6.

2      The Supreme Court has held that the Equal Protection Clause forbids the

3  challenging of potential jurors solely on account of their race.  See Batson v. Kentucky,

4  476 U.S. 79, 89 (1986).  Batson permits prompt rulings on objections to peremptory

5  challenges under a three-step process:

6      First, the criminal defendant must make out a prima facie case that the prosecutor

7  exercised peremptory challenges on the basis of race (or gender) "by showing that the

8  totality of the relevant facts gives rise to an inference of discriminatory purpose."  Batson,

9  476 U.S. at 93–94.  A federal habeas court need not dwell on the first step of the Batson

10  analysis if the matter has proceeded to the second or third step.  "Once a prosecutor has

11  offered a race-neutral explanation for the peremptory challenges and the trial court has

12  ruled on the ultimate question of intentional discrimination, the preliminary issue of

13  whether the defendant has made a prima facie showing becomes moot."  Hernandez v.

14  New York, 500 U.S. 352, 359 (1991); cf. Stubbs v. Gomez, 189 F.3d 1099, 1104 (9th Cir.

15  1999) (appellate court would not consider whether a prima facie showing had been made;

16  question was mooted by habeas evidentiary hearing at which prosecutor first explained

17  his peremptory challenges and district court found them to be race-neutral).

18      In the second step of a Batson analysis, the burden shifts to the prosecutor to

19  articulate a race-neutral explanation for striking the jurors in question.  Id. at 97.

20      Finally, the trial court must determine whether the defendant has carried his

21  burden of proving purposeful discrimination.  Batson, 476 U.S. at 98.  To fulfill its duty,

22  "[t]he court must evaluate the prosecutor's proffered reasons and credibility under the

23  totality of the relevant facts, using all the available tools including its own observations

24  and the assistance of counsel.  Mitleider v. Hall, 391 F.3d 1039, 1047 (9th Cir. 2004)

25  (citation and internal quotations omitted).  "As part of its evaluation of the prosecutor's

26  reasoning, the court must conduct a comparative juror analysis,  that is, it must

27  'compar[e] African American panelists who were struck with those non-African

28  American panelists who were allowed to serve.'"  Jamerson v. Runnels, 713 F.3d 1218,

1  1224 (9th Cir. 2013) (citing <u>Briggs v. Grounds</u>, 682 F.3d 1165, 1170 (9th Cir. 2012)).

2  "Where the prosecutor's reason for striking a black juror applies 'just as well' to a

3  non-black juror who is selected for the panel, 'that is evidence tending to prove

4  purposeful discrimination' that should be considered in assessing the genuineness of the

5  prosecutor's proffered explanations.  <u>Id.</u> (citing <u>Miller-El v. Dretke</u>, 545 U.S. 231, 241

6  (2005)).  The court should "reevaluate the ultimate state decision in light of this

7  comparative analysis and any other evidence tending to show purposeful discrimination

8  to decide whether the state was unreasonable in finding the prosecutor's race-neutral

9  justifications to be genuine."  <u>Id.</u> at 1225.

10     "[I]n evaluating habeas petitions premised on a <u>Batson</u> violation, 'our standard is

11  doubly deferential: unless the state appellate court was objectively unreasonable in

12  concluding that a trial court's credibility determination was supported by substantial

13  evidence, we must uphold it.'"  <u>Jamerson</u>, 713 F.3d at 1225 (citing <u>Briggs</u>, 682 F.3d at

14  1170).  The standard is demanding, but not insatiable.  <u>Miller-El</u>, 545 U.S. at 240.  A

15  federal habeas court will not be bound by state court factual findings unsupported in the

16  record or refuted by it, for example.  <u>See</u>, <u>e.g.</u>, <u>Snyder</u>, 552 U.S. at 480–84 (the trial judge

17  committed clear error in accepting prosecution's race-neutral explanation for the

18  peremptory strike of a black juror – that the juror's concern over jury service interfering

19  with his student teaching obligation would cause him to return a verdict on a lesser

20  included offense in order to avoid a penalty phase – when the record shows that the dean

21  of juror's school agreed to allow juror to make up the missed time after which juror

22  expressed no further concerns, and the prosecutor chose not to strike white jurors who

23  expressed similar concerns over conflicting obligations but instead elicited assurances

24  that they would still be able to fulfill their jury service).

25     In evaluating the race-neutral explanation, the court must keep in mind that proof

26  of discriminatory intent or purpose is required to show a violation of the Equal Protection

27  Clause.  <u>See</u> <u>Hernandez</u>, 500 U.S. at 355–62 (no discriminatory intent where Latino jurors

28  dismissed because of possible difficulty in accepting translator's rendition of Spanish

1    language testimony).  It should also keep in mind that a finding of discriminatory intent

2    turns largely on the trial court's evaluation of the prosecutor's credibility.  See Rice v.

3    Collins, 546 U.S. 333, 340–41 (2006).  Because determinations of credibility and

4    demeanor of the prosecutor and jurors lie "peculiarly within the trial judge's province,"

5    the trial court's ruling on the issue of discriminatory intent is entitled to "great deference"

6    and must be sustained unless clearly erroneous.  Snyder v. Louisiana, 552 U.S. 472, 477

7    (2008) (trial judge committed clear error in rejecting Batson objection to peremptory

8    strike of black juror because prosecution's explanation for strike was unconvincing and

9    suspicious because prosecutor accepted white jurors who expressed similar concerns over

10   conflicting obligations after eliciting assurances from them that they would still be able to

11   fulfill their jury service).

12        Here,  since the trial court ruled on the ultimate question of intentional

13   discrimination, the Court begins its federal habeas review at the second Batson step.

14   Hernandez, 500 U.S. at 359.  The Court finds that the prosecutor has offered a race-

15   neutral reason for the peremptory strike of J.H.: the prosecutor believed that J.H.'s

16   hesitancy and reluctance to provide information about her brothers' convictions of serious

17   crimes indicated that she might not be fair and impartial, and might approach the

18   prosecutor's case with an open mind.  The prosecutor stated that he would not want any

19   juror, regardless of race, who was inclined to hide information from the court.  Reporter's

20   Augmented Transcript ("RAT")[3] at 186–87.

21        The Court therefore turns to the third Batson step and evaluates whether the state

22   appellate court was objectively unreasonable in concluding that the trial court's

23   credibility determination was supported by substantial evidence, Jamerson, 713 F.3d at

24   1225, and whether there is evidence of purposeful discrimination, see Hernandez, 500

25   U.S. at 355–62.  Potential juror J.H. was the only African-American in the venire that was

26

---

27        [3]The Reporter's Augmented Transcript is lodged at Docket No. 24.  The cover sheet to
    Docket No. 24 states that it is Volume 1 of 5.  However, there are no other volumes of the RAT

28   lodged with the Court.  Accordingly, the Court presumes that the heading on the cover sheet is a
    typographical error and that there is only volume of the RAT.

called.  RAT at 181.   The prosecutor's first peremptory challenge was to a white male

with the surname Lewis.  RAT at 183.  His second peremptory challenge was to a white

female with the surname Jamerson.  Id.  J.H. was the prosecutor's third peremptory

challenge.  Id.  The prosecutor explained that he was concerned that J.H.'s brothers had

been convicted of very serious crimes and that she was "extremely reluctant and hesitant

to provide any information":

> It was literally pulling the information [about her brothers and their convictions]
> from within her... She basically gave the impression that she did not know very
> much about [her brothers'] case.  I think that was belied by her responses.
> [Defense counsel] described it as her biggest sin and only sin that she didn't
> remember right away what happened with her brothers. . . . it became clear to me,
> based upon her responses the amount of pause she took before answering the
> questions and her demeanor, that she actually knew more information.

Id. at 184.  The prosecutor noted that she initially stated that she knew very little about

her brothers' case and mostly heard about it through her parents who lived in Ohio.

However, her juror questionnaire indicated that she knew which prisons her brothers had

been housed in and, in her voir dire responses, she acknowledged that she was the only

family member living in the Bay Area during the trial (which was held in either San

Francisco of Oakland), and that she was subpoenaed to testify at the trial.  The trial court

found the prosecutor's evaluation of J.H. credible, noting:

> [The prosecutor] was finding out so much information from [J.H.] on voir dire
> that there was a question of whether or not [J.H.] was, in fact, being accurate and
> truthful, or was actually withholding information.  I don't think [J.H.] was in any
> way being dishonest from the total summary, but the reality that [the prosecutor]
> could be concerned about that was real.   [J.H.] sure seemed to remember, once
> pushed, a lot of things.
>
> So I am accepting [the prosecutor's] sworn testimony that [J.H.] created problems
> for him because of that conduct, and it had nothing to do with race.  I'm also
> clear, I think, in finding the presumption that on paper I begin with the idea that
> this person could be compared to others and would be satisfactorily even be seen
> as a pro-prosecution juror possibly, so as we did the presumption test, and it was
> passed well. But the reality is, I accept [the prosecutor's] position completely.

RAT at 188.

After carefully reviewing the record, the Court concludes that the state appellate

court was not objectively unreasonable in concluding that the trial court's credibility

1  determination was supported by substantial evidence.  Here, the prosecutor offered
2  specific reasons for his challenges, which the trial court found credible.  The trial court
3  agreed that, under questioning, the degree to which  J.H. recalled significantly more
4  details about her brothers' convictions than she had earlier led the court to believe, raised
5  a question as to whether J.H. had been withholding information.  The trial court
6  concluded that while J.H. was not being dishonest, the prosecutor's concern about
7  whether J.H. was withholding information was "real" and supported by J.H.'s responses
8  to questions about her brothers' convictions.  Moreover, the trial court noted that J.H., on
9  paper, seemed to be a pro-prosecution witness.  In addition, none of the remaining
10  panelists had immediate relatives who had committed serious crimes and were hesitant to
11  discuss these relatives.  The trial court's credibility determination was supported by
12  substantial evidence in the record, and Petitioner has not presented clear and convincing
13  evidence to the contrary.  <u>Miller-El</u>, 537 U.S. at 340, 123 S.Ct. 1029.  These factual
14  findings by the state court are therefore presumed correct.  <u>Id.</u>  Presuming that the
15  prosecutor exercised his peremptory challenge in a race neutral manner, the Court finds
16  that there is no evidence of discriminatory intent or purpose.  Accordingly, there has been
17  no violation of the Equal Protection Clause.

18         Having reviewed the underlying record, the Court concludes that the state court's
19  rejection of this claim was not contrary to, or involved an unreasonable application of,
20  clearly established Supreme Court precedent, nor was it based on an unreasonable
21  determination of the facts in light of the evidence presented in the state court proceeding.
22  28 U.S.C. § 2254(d).  Petitioner is not entitled to habeas relief on this claim.

23                              **CONCLUSION**

24         For the reasons set forth above, the petition for writ of habeas corpus is DENIED.
25  The federal rules governing habeas cases brought by state prisoners require a district
26  court that denies a habeas petition to grant or deny a certificate of appealability ("COA")
27  in its ruling.  <u>See</u> Rule 11(a), Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254.
28  Petitioner has not shown "that jurists of reason would find it debatable whether the

petition states a valid claim of the denial of a constitutional right." <u>Slack v. McDaniel</u>,

529 U.S. 473, 484 (2000).  Accordingly, a COA is **DENIED**.

      The Clerk shall close the file.

      **IT IS SO ORDERED.**

DATED:      3/31/2015
    _____

                                  EDWARD J. DAVILA
                                  United States District Judge